UNITED STATES DISTRICT COURT
DISTRICT OF ALASKA

| UNITED STATES OF AMERICA, | No. 3:18-cr-00066-SLG-DMS |
|---|---|
| Plaintiff, | **INITIAL REPORT AND RECOMMENDATION REGARDING DEFENDANTS' MOTION TO SUPPRESS EVIDENCE** |
| vs. | |
| DWAYNE DOLLISON, JR., and KENNETH MARTIN DOUGLAS, | **[Docs. 40, 42]** |
| Defendants. | |

# I. INTRODUCTION

Defendant Kenneth Martin Douglas moved to suppress all evidence obtained as a result of Alaska State Trooper (AST) Tyler Langford's traffic stop of two vehicles in the early morning of September 16, 2017. (Doc. 40). Co-defendant Dwayne Dollison joined the motion. (Doc. 42). The government responded in opposition. (Doc. 43).

The defense motion argues, first, that the length of Trooper Langford's stop of Dollison's vehicle was not supported by reasonable suspicion and therefore violated the Fourth Amendment. Second, the motion argues that Trooper Langford's search of the second vehicle, a rental listing both Douglas and Dollison on its rental agreement, lacked valid consent. Specifically, the defense argues that although Trooper Langford received consent to search the second vehicle from the person driving the vehicle at the time, she did not have authority to give consent because only Douglas and Dollison were listed on the rental agreement as permitted drivers.

On February 13, 2019, an evidentiary hearing was held. (Doc. 63). Thereafter, Dollison filed supplemental briefing, which Douglas joined. (Doc. 64, 67). The government filed a response. (Doc. 68). The motion is ripe for resolution. The Court recommends that the Motion to Suppress be DENIED.

## II. STATEMENT OF FACTS

In the early morning of September 16, 2017, around 4:20 a.m., AST Tyler Langford was driving outbound on the Parks Highway, away from Fairbanks, when he observed headlights approaching inbound. (Doc. 65 at 18-18). As he passed, Langford saw that there were two vehicles, a maroon sedan and, tailgating behind it, a gold SUV.[1] (Doc. 65 at 19). Langford clocked the vehicles traveling 70 m.p.h. in a 55 m.p.h. zone, turned on his lights and siren, and reversed direction. (Doc. 65 at 17-19). Although Langford was unaware of it at the time of the stop, the vehicles and their movement were consistent with a confidential tip describing a drug transport that the FBI had received one day earlier. (Doc. 40 at 2 n. 2, 65 at 20).

Both vehicles responded to Langford's siren and pulled over. (Doc. 65 at 20). Langford testified this was unusual. (Doc. 65 at 20). He first approached the vehicle nearest him, the gold SUV, and observed Dwayne Dollison sitting in the driver's seat and Kenneth Douglas in the passenger's seat. (Doc. 65 at 20-21). Langford introduced himself, asked the two men why they were speeding, requested their identification information, and instructed them to "sit tight". (Doc. 20-21).

---

[1] Although throughout most of the hearing Langford referred to the SUV as white, upon cross-examination he corrected himself with reference to the report he had written at the time of the stop. (Doc. 65 at 92).

*United States v. Dollison, Douglas*
3:18-cr-00066-SLG-DMS
Initial R&R re Motion to Suppress Evidence
2
Case 3:18-cr-00066-SLG   Document 76   Filed 03/18/19   Page 2 of 16

Trooper Langford then approached the maroon sedan, where he observed Kelly Wylie in the driver's seat and Casey Strickland in the passenger's seat. (Doc. 65 at 21-22). Langford introduced himself to the two women, asked why they had been speeding, and requested their identification information. (Doc. 65 at 22). Ms. Wylie stated she didn't have vehicle registration information because it was a rental car, but she provided the rental agreement. (Doc. 65 at 22-23). This agreement listed Mr. Douglas, the passenger of the gold SUV, as the billing recipient for the vehicle. (Doc. 65 at 23). Mr. Dollison was also authorized to have possession of the car under the agreement. (Doc. 65 at 8).

When Trooper Langford returned to his patrol car, a check of the four IDs revealed that Mr. Douglas was on state probation for drug-related charges and Mr. Dollison was on federal probation for drug-related conspiracy charges. (Doc. 65 at 23-25). Because Langford was aware that probation often includes conditions restricting geographical movement or allowing a search, he contacted the Fairbanks probation office seeking additional information. (Doc. 65 at 25). The Fairbanks office forwarded his call to Anchorage's probation office, where Langford reached a voicemailbox and left a message. (Doc. 65 at 25-26).

At this point, Trooper Walsh[2] arrived on the scene and began speaking with Douglas and Dollison. (Doc. 65 at 25, Def. Ex. B at 00:03). The two men told Walsh they did not know the driver of the maroon sedan. (Def. Ex. B at 01:30).

Trooper Langford left his patrol vehicle, activated his audio recorder, and

---

[2] The first name of Trooper Walsh does not appear in the record.

*United States v. Dollison, Douglas*
3:18-cr-00066-SLG-DMS
Initial R&R re Motion to Suppress Evidence 3
Case 3:18-cr-00066-SLG Document 76 Filed 03/18/19 Page 3 of 16

returned to the gold SUV. (Doc. 65 at 28, Gov. Ex. 1 at 00:00).[3] At some point, Walsh told Langford that the men had claimed to know nothing and have no relation to the maroon sedan, contradicting what Langford knew; that Douglas was on that car's rental agreement. (Doc. 65 at 28). As he walked toward the vehicle, Langford stated into his recorder that he had pulled over two vehicles for traveling 70 m.p.h. in a 55 m.p.h. zone and noted, "something's not lining up." (Gov. Ex. 1 at 00:01). Langford asked Douglas to exit the vehicle and confirm that he did not know the people in the maroon sedan. (Gov. Ex. 1 at 00:40). When Douglas confirmed this, Trooper Langford asked why his name was on the rental agreement for the vehicle. (Gov. Ex. 1 at 00:53). Douglas replied that he did not know. (Gov. Ex. 1 at 01:04). Trooper Langford then stated that the women said they knew the two men. (Gov. Ex. 1 at 1:25). Dollison chimed in, "We know them, but we didn't know that was the car you pulled over." (Gov. Ex. 1 at 01:35).

Trooper Langford, seeming to have lost his patience, then told the men, "We're going to be straight right now, are there drugs in this car?" (Gov. Ex. 1 at 01:55). When the men denied that there were, Langford asked permission to search it and was told by Douglas, "Be my guest." (Gov. Ex. 1 at 02:03). Langford then asked about the other car, to which Douglas replied, "That has nothing to do with

---

[3] The Government's response at Docket 68 to the defense's supplemental briefing at Docket 64 includes a transcript of AST's contact interviews with the defendants. (Doc. 68-1). However, the transcript contains errors. The transcript states that it begins with Trooper Langford's initial interview with the defendants, but in fact it begins with Trooper Walsh's initial interview. *See* Def. Ex. B. Additionally, when the transcript finally reaches Langford's interview, on page 6, it excludes several seconds of legally significant audio from the moment Langford activated his recording and expressed suspicion, noting, "something's not lining up." *See* (Gov. Ex. 1 at 00:01). Accordingly, the Court has chosen in this report to cite directly to the time stamps of the two troopers' audio recordings at Def. Ex. B and Gov. Ex. 1.

*United States v. Dollison, Douglas*
3:18-cr-00066-SLG-DMS
Initial R&R re Motion to Suppress Evidence
4
Case 3:18-cr-00066-SLG   Document 76   Filed 03/18/19   Page 4 of 16

me. I'm not on that car. This is my car right here." (Gov. Ex. 1 at 2:15).[4]

While Trooper Langford was searching the SUV, he received a call from the Anchorage probation office returning his earlier call. (Gov. Ex. 1 at 7:20). Apparently in response to a question posed by the probation officer (PO), Langford asked Douglas whether he was allowed to be in Fairbanks. (Gov. Ex. 1 at 07:50). Langford then put the PO on speaker phone, who told Douglas he did not have permission to go any farther north than Wasilla. (Gov. Ex. 1 at 09:53). Langford then told Walsh he was going to question the women in the maroon sedan. (Gov. Ex. 10:30, Doc. 65 at 41-42).

When he arrived at the sedan, Trooper Langford informed Ms. Wylie that his check had revealed her license was cancelled. (Gov. Ex. 1 at 10:54). He then asked the women whether they knew Douglas and Dollison. (Gov. Ex. 1 at 11:10). When the women told Langford the two men were their boyfriends, Langford asked if that was the case why the two men denied knowing them. (Gov. Ex. 1 at 11:10). The women did not know. (Gov. Ex. 1 at 11:25). Langford asked if there were drugs in the car, and Wylie gave him permission to search. (Gov. Ex. 1 at 11:45).

Trooper Langford asked the women to whom did the bags in the main area of the vehicle belong, and Ms. Wylie answered they were hers. (Gov. Ex. 1 at 13:00). As Langford searched the vehicle, he openly discussed his thought process with the women, explaining, "It really perks my ears up when I hear they're on probation for

---

[4] It is unclear from the audio which defendant makes these statements. However, both Douglas's motion (Doc. 40 at 4) and the government's responses (Doc. 68 at 6-7, 68-1 at 9) identify the speaker as Douglas.

*United States v. Dollison, Douglas*
3:18-cr-00066-SLG-DMS
Initial R&R re Motion to Suppress Evidence    5

Case 3:18-cr-00066-SLG   Document 76   Filed 03/18/19   Page 5 of 16

drugs and other things like that and then they're saying they don't know you guys and you're saying you're with them." (Gov. Ex. 1 at 12:20).

At one point, Trooper Langford found a scale, which one of the women claimed was used for marijuana. (Gov. Ex. 1 at 14:00, Doc. 65 at 44). Later, Ms. Wylie stopped Langford to warn him there was a pink bag with needles, which she claimed were insulin needles for her diabetes and that they were collected for the exchange. (Gov. Ex. 1 at 17:15). When Langford asked Wylie whether she had type 1 or type 2 diabetes, she answered type 2, but later corrected, "No, I lied, it's type 1." (Gov. Ex. 1 at 17:24). Langford pressed for consistency, and Wylie claimed that her condition type had changed in the past six months. (Gov. Ex. 1 at 17:35). Langford also found Mr. Douglas's insurance card in the maroon sedan. (Gov. Ex. 1 at 19:00). One of the women said he used that to get the rental. (Gov. Ex. 1 at 19:09).

Trooper Langford eventually found a needle with a brown substance in it, which Ms. Wylie claimed to be blood. (Gov. Ex. 22:39). Minutes later, he found a cook spoon, used for cooking heroin. (Gov. Ex. 1 at 24:29). Contradicting Wylie's earlier statement that the bags were all hers, the women then claimed that the purse in which Langford found the cook spoon was not theirs but their friend Ashley's. (Gov. Ex. 1 at 24:35). Langford eventually found another scale and more needles, including one loaded with what Langford identified as possibly heroin. (Gov. Ex. 1 at 26:30). He and Walsh arrested the women and later decided to impound the vehicle until they could receive a warrant to search any bags in the

*United States v. Dollison, Douglas*
3:18-cr-00066-SLG-DMS
Initial R&R re Motion to Suppress Evidence 6
Case 3:18-cr-00066-SLG   Document 76   Filed 03/18/19   Page 6 of 16

trunk. (Gov. Ex. 1 at 27:20, 41:40, 48:22). At no point did Douglas or Dollison make any effort to stop Langford's search of the maroon sedan. (Doc. 65 at 54-55).

### III. DISCUSSION

A. **Reasonable Suspicion Supported the Stop of Douglas and Dollison.**

Police may detain or seize an individual for brief, investigatory purposes. *Terry v. Ohio*, 392 U.S. 1, 20-22 (1968); *United States v. Orman*, 486 F.3d 1170, 1173 (9th Cir. 2007). Such an investigatory stop does not violate the Fourth Amendment if the officer has a reasonable suspicion supported by articulable facts that criminal activity may be afoot. *United States v. Berber-Tinoco*, 510 F.3d 1083, 1087 (9th Cir. 2007); *United States v. Lopez-Soto*, 205 F.3d 1101, 1104 (9th Cir. 2000). A traffic violation alone is sufficient to justify an investigatory stop. *United States v. Choudhry*, 461 F.3d 1097, 1100 (9th Cir. 2006) (citing to *Whren v. United States*, 517 U.S. 806, 810 (1996)).

The Supreme Court has observed that no strict limits govern the length of a *Terry* stop; rather, the question is whether the law enforcement officer pursued his investigation in a diligent and reasonable manner. *United States v. Sharpe*, 470 U.S. 675, 687 (1985). The officer may conduct certain checks unrelated to the initial stop so long as they are supported by reasonable suspicion. *Rodriguez v. United States*, 135 S.Ct. 1609, 1615 (2015). An otherwise valid traffic stop <u>may</u> become unlawful if prolonged beyond the time necessary to issue a ticket. *Illinois v. Caballes*, 543 U.S. 405, 407-408. However, where an initial stop uncovers new grounds for suspicion of criminal activity, the period of detention may be

permissibly extended. *United States v. Mayo*, 394 F.3d 1271, 1276 (9th Cir. 2005).

Here, Trooper Langford had reasonable suspicion to believe that defendants had violated the law when he clocked their vehicle traveling 15 m.p.h. over the posted speed limit. *See Choudhry*, 461 F.3d at 1100. The initial stop was therefore lawful. *Terry*, 392 U.S. at 20-22.

Although the stop eventually lasted an hour and a half—in other words, a great deal longer than is necessary to issue a speeding ticket—the evidence shows that the stop yielded further reasons to suspect that criminal activity was afoot. After introducing himself and taking identifying information from the defendants and the occupants of the maroon sedan, Trooper Langford performed a routine check of these IDs in AST's databases. As noted, his check revealed that both defendants were on probation for drug-related charges. Because Langford knew that probationers often face geographic and/or search conditions, he followed up on this information by calling first the Fairbanks and then the Anchorage probation offices, leaving a voicemail with the latter. These investigatory steps were reasonable and conducted in a diligent and timely manner.

At this point, Langford decided to return to the defendants' vehicle. Shortly thereafter Trooper Walsh told Langford the defendants had denied knowing the maroon sedan or having anything to do with it. Because Langford knew that both men were on the rental agreement, their false statement to Trooper Walsh created reasonable suspicion justifying further investigation.

Further investigation did not alleviate Langford's suspicions. Confronted

*United States v. Dollison, Douglas*
3:18-cr-00066-SLG-DMS
Initial R&R re Motion to Suppress Evidence
8
Case 3:18-cr-00066-SLG   Document 76   Filed 03/18/19   Page 8 of 16

with this inconsistency, Douglas could only reply that he did not know the reason for it. Dollison admitted, "We know them, but we didn't know that was the car you pulled over." Given that the car was parked directly ahead of them, this statement was inexplicable.

Langford voiced his suspicions and asked whether any drugs were in their vehicle. With the defendants' consent, Langford proceeded to search the vehicle, during which time Douglas's PO officer returned Langford's call. The PO informed Douglas he had violated his probation by travelling north of Wasilla. This violation served as yet further grounds for Langford to reasonably suspect criminal activity was afoot. Given that both defendants were on the rental agreement for the maroon sedan, Langford's decision at that point to further question its occupants was also reasonable.

This questioning did not clarify the inconsistency of the defendants' account. Although both women stated that they knew the defendants, neither could explain why the men would deny knowing them. The women also consented to a search of their vehicle, which produced multiple scales and several bags worth of needles, including at least one loaded with what Trooper Langford identified as heroin; and which resulted in Ms. Wylie's arrest. Because the defendants were listed on the rental agreement of the maroon sedan, their detention for the duration of Langford's search of the sedan was reasonable.

Each step of Langford's investigation uncovered yet further ground for reasonable suspicion criminal activity was afoot, justifying his repeated extensions

*United States v. Dollison, Douglas*
3:18-cr-00066-SLG-DMS
Initial R&R re Motion to Suppress Evidence 9
Case 3:18-cr-00066-SLG Document 76 Filed 03/18/19 Page 9 of 16

of the stop's duration. *See Rodriguez*, 135 S.Ct. at 1615; *Mayo*, 394 F.3d at 1276. In other words, Langford's traffic stop of the defendants and his subsequent investigation were conducted in a diligent and reasonable manner. *See United States v. Sharpe*, 470 U.S. at 687. As a result, the stop was not overlong and did not violate the defendant's rights under the Fourth Amendment.

### B. Valid Consent Supported the Search of the Maroon Sedan.

A search need not be supported by warrant or probable cause where it is conducted pursuant to valid consent. *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973). A third party may validly consent to a search so long as they possess common authority over the premises or effects to be sought. *United States v. Matlock*, 415 U.S. 164, 171 (1974). Common authority does not need to be based upon a formal property interest but instead may derive from the third party's joint access or control over property. *Id.* at 171 n. 7; *see also Frazier v. Cupp*, 394 U.S. 731, 740 (1969) (rejecting the "metaphysical subtleties" of petitioner's claim that third party's authorized use of duffel bag compartment did not include the authority to consent to search of the entire duffel bag); *United States v. Mazzarella*, 784 F.3d 532, 540 (9th Cir. 2015); *United States v. Ruiz*, 428 F.3d 877, 882 (9th Cir. 2005) (holding that access to or control over a container conveys actual authority to consent to its search).

A third party with access or control over property cannot give valid consent, however, where the property owner has explicitly denied a request to conduct a search. *Georgia v. Randolph*, 547 U.S. 103, 120 (2006). Nevertheless, a third party's

*United States v. Dollison, Douglas*
3:18-cr-00066-SLG-DMS
Initial R&R re Motion to Suppress Evidence
10
Case 3:18-cr-00066-SLG   Document 76   Filed 03/18/19   Page 10 of 16

consent to a search is valid even when given in the presence of the property owner so long as the owner does not object. *See Matlock*, 415 U.S. at 164; *United States v. Canada*, 527 F.2d 1374, 1379 (9th Cir. 1975) (upholding as valid consent an airline agent's request for permission of the defendant's companion to open a suitcase, where neither the companion nor the defendant, <u>who was present throughout the exchange</u>, objected).

The defense does not dispute that Ms. Wylie consented to Trooper Langford's request to search the maroon sedan. It merely disputes whether Ms. Wylie had authority to do so.

The defense's motion attempts to distinguish between Wylie's authority to drive the rental car, on the one hand, and her ability to consent to searches of (1) the glove compartment or (2) bags owned by other persons within the car. (Doc. 40 at 12-14). The first concern, distinguishing the glove compartment from the vehicle itself, is mooted by Supreme Court precedent. *See Frazier*, 394 U.S. at 740 (rejecting the "metaphysical subtleties" of petitioner's claim that third party's authorized use of duffel bag compartment did not include the authority to consent to search of the entire duffel bag). The second is rebuffed by the fact that when asked by Langford, Wylie identified the bags which Langford intended to search as hers.

As the defendants' motion notes, the Ninth Circuit has set out two ways a third party may establish common authority to consent to a search: (1) where the owner of property has expressly authorized the third party to give consent, and (2) where the third party has joint access or control. *United States v. Davis*, 332 F.3d

1163, 1169 (9th Cir. 2003). While the motion argues that no evidence shows Mr. Douglas authorized Wylie to permit a search, the evidence does show that Wylie had joint access and control over the vehicle. Wylie drove the rental vehicle from Anchorage to outside Fairbanks in tandem with the defendants, who were listed on the vehicle's rental agreement. No evidence shows that she lacked their permission to do so. Although Wylie was not listed on the rental agreement, no formal property interest is necessary to establish either common authority or a legitimate privacy interest. *See Matlock*, 415 U.S. at n. 7; *Byrd v. United States*, 138 S.Ct. 1518, 1531 (2018). Accordingly, it appears clear that Wylie had authority to consent to the vehicle's search.

Following the hearing, the defense filed supplemental briefing arguing that Ms. Wylie's consent was also invalid because Mr. Douglas was present during the search of the sedan but Trooper Langford chose not to ask for his consent. The briefing includes several cases which the defense argues lead to the conclusion that Langford's search lacked consent. Each is readily distinguishable from the case at hand.

The first, *United States v. Impink*, dealt with a Drug Enforcement Agency ("DEA") search of a garage on leased property. 728 F.2d 1228 (9th Cir. 1984). There, the owner of a house leased it to another person but retained the right to store a space heater in the garage and re-enter to retrieve the heater as needed. *Id.* at 1230. When the owner stopped by and observed what appeared to be a laboratory in the garage, she sought permission to enter the house but was turned away by the

*United States v. Dollison, Douglas*
3:18-cr-00066-SLG-DMS
Initial R&R re Motion to Suppress Evidence 12
Case 3:18-cr-00066-SLG   Document 76   Filed 03/18/19   Page 12 of 16

lessee's houseguest. *Id.* The owner provided a tip to the DEA, who sent two officers to interview the lessee and his houseguest. *Id.* In spite of the lessee being on the property at the time, the officers did not seek the lessee's permission before entering the property through a locked fence and observing a meth-manufacturing operation through a garage window. *Id.* at 1230.

Although the Ninth Circuit determined that the officer's lacked valid consent to enter, *Impink* presented a question far narrower and more complicated than the one here, namely: whether a lessor who had expressly reserved the right to store a space heater in the garage retained authority to consent to a search of the garage. *Id.* at 1232. In holding that the lessor did not, the Ninth Circuit emphasized the owner's very narrow rights of access, finding it unlikely that an informal oral-agreement to store a space-heater, with a right of reentry to retrieve that heater, allowed police to enter the property near midnight with a purpose wholly unrelated to the space-heater. *Id.* at 1233. The court also noted that the police knew the lessee was present during the search but intentionally bypassed the lessee to rely on the lessor's dubious consent. *Id.* at 1233-35. Finally, the court noted that the lessor's authority was doubly dubious since the lessor had earlier been explicitly ejected from the property by the lessee's houseguest. *Id.* at 1234. The Ninth Circuit concluded from the totality of these circumstances that the police had lacked valid consent to conduct their search. *Id.*

In contrast with the owner's limited rights of access in *Impink*, Ms. Wylie enjoyed a far greater possessory interest in the vehicle here. Ms. Wylie had

*United States v. Dollison, Douglas*
3:18-cr-00066-SLG-DMS
Initial R&R re Motion to Suppress Evidence 13
Case 3:18-cr-00066-SLG   Document 76   Filed 03/18/19   Page 13 of 16

complete access to and control over the vehicle as she drove it from Anchorage to Fairbanks. Whereas the lessor in *Impink* had permission merely to access the garage to retrieve her space heater, there is no evidence suggesting that Wylie's access was restricted. Nor does it appear it could have been, since Mr. Douglas ceded control of the vehicle to Wylie when he allowed her to drive it. Thus it was appropriate for Trooper Langford to conclude that the consent she gave was valid. Additionally, unlike the lessee's houseguest who explicitly ordered the lessor to leave the property, neither Douglas nor Dollison ever explicitly instructed Ms. Wylie, or even Trooper Langford, to leave the sedan.

The only fact that bears similarity to the case at hand is that, like the lessee in *Impink*, Douglas was present for the search but Langford did not formally ask his permission. However, immediately after obtaining the consent of Douglas to search the gold SUV Douglas was driving, Langford asked about the maroon sedan. For the third time, Douglas denied any connection to the maroon car, stating, "That has nothing to do with me. I'm not on that car. This is my car right here." (Gov. Ex. 1 at 2:15.)

Absent some explicit objection, the mere presence of a property-owner does not invalidate the consent of a third-party with common authority over the property. *See Matlock*, 415 U.S. at 164; *Canada*, 527 F.2d at 1379. Although present at the time, Douglas and Dollison never instructed Trooper Langford to stop his search of the sedan. Accordingly, *Impink* does not determine the validity of Wylie's consent.

*United States v. Dollison, Douglas*
3:18-cr-00066-SLG-DMS
Initial R&R re Motion to Suppress Evidence
14
Case 3:18-cr-00066-SLG Document 76 Filed 03/18/19 Page 14 of 16

The defense's supplemental briefing also cites to *United States v. Padron*, 657 F.Supp. 840 (D. Del. 1987). However, that district court case out of Delaware did not doubt the third-party driver's ability to consent to a search of the automobile while the owner sat in it as a passenger. Instead, the *Padron* court found that the third-party's consent to search the automobile did not support a search of the owner's bag in the backseat. *Id.* at 847.

Likewise, *Johnson v. State*, 905 P.2d 818 (Okla. Crim. App. 1995) is inapposite to the facts at hand. In that Oklahoma state-case, the officer knew that the vehicle's driver was not its owner, but nevertheless asked for the driver's consent to search it outside the owner's presence. *Id.* at 821. The Court emphasized, "[t]he fact that McBride was aware who owned the car is crucial to our holding." *Id.* Here, however, Langford was never certain who had authority over the vehicle. Although the rental agreement listed Douglas and Dollison, both defendants told Walsh they had nothing to do with the sedan. Douglas later confirmed this to Langford. When confronted with the fact that his name appeared on the vehicle's rental agreement, Douglas merely replied that he did not know why. Meanwhile, Wylie was in complete possession of the vehicle when pulled over by Langford. Thus, it was reasonable for Langford to conclude that Wylie had common authority to consent to a search.

Accordingly, Langford's search was pursuant to valid consent and did not violate the Fourth Amendment.

# III. CONCLUSION

Based on the foregoing analysis, this Court recommends that defendants' motion to suppress be DENIED.

DATED this 18th day of March, 2019 at Anchorage, Alaska.

S/DEBORAH M. SMITH
CHIEF U.S. MAGISTRATE JUDGE

Pursuant to D.Ak.L.M.R. 6(a), a party seeking to object to this proposed finding and recommendation shall file written objections with the Clerk of Court no later than **CLOSE OF BUSINESS, MARCH 25, 2019**. Failure to object to a magistrate judge's findings of fact may be treated as a procedural default and waiver of the right to contest those findings on appeal. *Miranda v. Anchondo, et. al*, 684 F.3d 844 (9th Cir. 2012). The Ninth Circuit concludes that a district court is not required to consider evidence introduced for the first time in a party's objection to a magistrate judge's recommendation. *United States v. Howell*, 231 F.3d 615 (9th Cir. 2000).

Objections and responses shall not exceed **five (5) pages** in length, and shall not merely reargue positions presented in motion papers. Rather, objections and responses shall specifically designate the findings or recommendations objected to, the basis of the objection, and the points and authorities in support. Response(s) to the objections shall be filed on or before **CLOSE OF BUSINESS, MARCH 28, 2019.** The parties shall otherwise comply with provisions of D.Ak.L.M.R. 6(a). The shortened objection and response deadlines are necessary due to the looming trial date. D.AK.L.M.R. 6(a) authorizes the court to alter the standard objection deadlines.

Reports and recommendations are not appealable orders. Any notice of appeal pursuant to Fed.R.App.P. 4(a)(1) should not be filed until entry of the district court's judgment. *See Hilliard v. Kincheloe*, 796 F.2d 308 (9th Cir. 1986).

*United States v. Dollison, Douglas*
3:18-cr-00066-SLG-DMS
Initial R&R re Motion to Suppress Evidence 16
Case 3:18-cr-00066-SLG   Document 76   Filed 03/18/19   Page 16 of 16